# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**AMELLIA LETTICIA DE ANDA,**

      **Plaintiff,**

      vs.                                           **Civ. No. 15-678  KK**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 16) filed October 16, 2015, in support of Plaintiff Amellia Letticia De Anda's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title XVI supplemental security income benefits.  On December 15, 2015, Plaintiff filed her Motion to Reverse and Remand for Rehearing, With Supporting Memorandum ("Motion").  (Doc. 19.)  The Commissioner filed a Response in opposition on March 16, 2016 (Doc. 23), and Plaintiff filed a Reply on March 29, 2016.  (Doc. 24.)  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is well taken and is **GRANTED.**

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 4, 8, 9.)

## I.  Background and Procedural Record

Claimant Amellia Letticia De Anda ("Ms. De Anda") alleges that she became disabled on March 1, 2010, at the age of twenty-five, because of severe bipolar disorder, depression, anxiety, insomnia, scoliosis, and ovarian cysts.  (Tr. 223.[2])  Ms. De Anda completed the eleventh grade in 2004[3] (Tr. 224), and has worked as a house cleaner, truck stop clerk, customer support representative, and pizza maker.  (Tr. 224, 229.)

On April 24, 2011, Ms. De Anda protectively filed[4] an application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq.   (Tr. 30.) Ms. De Anda's application was initially denied on November 18, 2011.  (Tr. 75, 76-87, 141-44.) Ms. De Anda's application was denied again at reconsideration on March 6, 2012.  (Tr. 88, 89-103, 106-09.)  On March 23, 2012, Ms. De Anda requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 110-11.)  The ALJ conducted a hearing on August 29, 2013.  (Tr. 44-74.)  Ms. De Anda appeared in person at the hearing with attorney Josh Decker.[5]  (Tr. 44, 183.) The ALJ took testimony from Ms. De Anda (Tr. 50-70), and an impartial vocational expert ("VE"), Thomas Greiner.  (Tr. 70-74.)

On November 14, 2013, the ALJ issued an unfavorable decision.  (Tr. 27-39.)   In arriving at her decision, the ALJ determined that Ms. De Anda had not engaged in substantial

---

[2] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 16) that was lodged with the Court on October 16, 2015.

[3] Ms. De Anda reported to State agency examining medical consultant Dr. Karl Moedl that she finished high and had attended one semester of college.  (Tr. 294.)  She reported to State agency examining medical consultant Cathy L. Simutis, Ph.D., that she had completed the tenth grade, earned her GED, and completed one semester of college. (Tr. 299.)  Ms. De Anda testified that she earned her GED in 2004.  (Tr. 52.)

[4] Protective Filing Status is achieved once an individual contacts the Social Security Administration with the positive stated intent of filing for Social Security benefits.  The initial contact date is considered a claimant's application date, even if it is earlier than the date on which the Social Security Administration actually receives the completed and signed application.  *See* 20 C.F.R. §§ 404.614, 404.630, 416.325, 416.340, 416.345.

[5] Ms. De Anda is represented in this proceeding by Francesca MacDowell.  (Doc. 1.)

gainful activity since her application date of April 24, 2011.[6]  (Tr. 32.)  The ALJ found that

Ms. De Anda suffered from severe impairments of polysubstance abuse; depression; anxiety;

post-traumatic stress disorder ("PTSD"); borderline personality disorder; scoliosis; degenerative

disc disease of the lumbar spine; and obesity.  (*Id.*)  The ALJ found that these impairments,

individually or in combination, did not meet or medically equal one of the listed impairments in

20 CFR Part 404, Subpart P, Appendix 1. (*Id.*)

Because she found that Ms. De Anda's impairments did not meet a Listing, the ALJ then

went on to assess Ms. De Anda's residual functional capacity ("RFC").  The ALJ stated that

> [a]fter careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity to perform light work as defined in
> 20 CFR 416.967(b) except she cannot kneel, crouch, or crawl; she can perform
> simple tasks with few workplace changes; she can have no contact with the public
> and occasional superficial contact with co-workers.

(Tr. 34.)  Based on the testimony of the VE, the ALJ concluded that considering Ms. De Anda's

age, education, work experience, and RFC, there were jobs that existed in significant numbers in

the national economy that Ms. De Anda could perform and she was therefore not disabled.

(Tr. 38-39.)

On June 18, 2015, the Appeals Council issued its decision denying Ms. De Anda's

request for review and upholding the ALJ's final decision.  (Tr. 1-3.)  On August 4, 2015,

Ms. De Anda timely filed a Complaint seeking judicial review of the Commissioner's final

decision.  (Doc. 1.)

---

[6] Under Title XVI, there is no retroactivity of payment.  SSR 83-20, 1983 WL 31249, at *1.  Supplemental security
income (SSI) payments are prorated for the first month for which eligibility is established after application and after
a period of ineligibility.  *Id.*

## II. <u>Standard of Review</u>

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision[7] is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence.  42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record, but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner.  *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).  In other words, the Court does not reexamine the issues *de novo*.  *Sisco v. U.S. Dep't. of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993).  The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118.  Substantial evidence is "more than a scintilla, but less than a preponderance."  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992).  The Court's examination of the record as a whole must include "anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met."  *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence."  *Lax*, 489 F.3d at 1084 (quoting *Zoltanski v. Fed. Aviation Admin.*, 372 F.3d 1195, 1200 (10th Cir.

---

[7] A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which is generally the ALJ's decision.  20 C.F.R. §§ 404.981, 416.1481.  This case fits the general framework, and therefore, the Court reviews the ALJ's decision as the Commissioner's final decision.

2004)).  Thus, the Court "may not displace the agency's choice between two fairly conflicting views," even if the Court would have "made a different choice had the matter been before it *de novo*."  *Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks omitted).  As such, even if a reviewing court agrees with the Commissioner's ultimate decision to deny benefits, it cannot affirm that decision if the reasons for finding a claimant not disabled were arrived at using incorrect legal standards, or are not articulated with sufficient particularity. *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). "[T]he record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence."  *Id.* at 1009-10.  Rather, the ALJ need only discuss the evidence supporting his decision, along with any "uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Id.*; *Mays v. Colvin*, 739 F.3d 569, 576 (10th Cir. 2014).

### III. <u>Applicable Law and Sequential Evaluation Process</u>

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act if her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).  To qualify for disability insurance benefits, a claimant must establish a severe physical or mental

impairment expected to result in death or to last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process.  20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  At the first four steps of the evaluation process, the claimant must show that: (1) she is not engaged in "substantial gainful activity"; *and* (2) she has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) his impairment(s) meet or equal one of the Listings[8] of presumptively disabling impairments; *or* (4) she is unable to perform his "past relevant work."  20 C.F.R. § 416.920(a)(4)(i-iv); *Grogan* 399 F.3d at 1261.  If the claimant can show that her impairment meets or equals a Listing at step three, the claimant is presumed disabled and the analysis stops.  If at step three, the claimant's impairment is not equivalent to a listed impairment, before moving on to step four of the analysis, the ALJ must consider all of the relevant medical and other evidence, including all of the claimant's medically determinable impairments whether "severe" or not, and determine what is the "most [the claimant] can still do" in a work setting despite his physical and mental limitations.  20 C.F.R. § 416.945(a)(1)-(3).  This is called the claimant's residual functional capacity ("RFC").  20 C.F.R. §§ 416.945(a)(1) & (a)(3).  The claimant's RFC is used at step four to determine if she can perform the physical and mental demands of her past relevant work.  20 C.F.R. § 416.920(a)(4), 416.920(e).  If the claimant establishes that she is incapable of meeting those demands, the burden of proof then shifts to the Commissioner, at step five of the sequential evaluation process, to show that the claimant is able to perform other work

---

[8] 20 C.F.R. pt. 404, subpt. P. app. 1.

in the national economy, considering her residual functional capacity ("RFC"), age, education, and work experience.  *Id.*, *Grogan*, 399 F.3d at 1261.

Although the claimant bears the burden of proving disability in a Social Security case, because such proceedings are nonadversarial, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised."  *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006).  "This is true despite the presence of counsel."  *Henrie*, 13 F.3d at 361.  "The duty is one of inquiry and factual development," *id.*, "to fully and fairly develop the record as to material issues."  *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997).  This may include, for example, an obligation to obtain pertinent medical records or to order a consultative examination.  *Madrid*, 447 F.3d at 791-92.  The duty is triggered by "some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation."  *Hawkins*, 113 F.3d at 1167.

## IV. <u>Analysis</u>

Ms. De Anda asserts three arguments in support of reversing and remanding her case, as follows: (1) the ALJ erred in evaluating the medical opinion evidence; (2) the ALJ's RFC failed to include all of Ms. De Anda's limitations; and (3) the ALJ posed an improper hypothetical to the VE.  (Doc. 19 at 5, 8-26.)  Because the Court finds grounds for remand as discussed below, the Court does not specifically analyze all of Ms. De Anda's arguments.  *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

A. <u>**Mental Health Records**</u>[9]

Ms. De Anda's mental health records contained within the administrative record begin in 2010 with her treatment for major depressive disorder and anxiety at Coastal Carolina Neuropsychiatric Center from March 30, 2010 until August 30, 2010. (Tr. 275-77, 339-348.) During this treatment history, Ms. De Anda, who was diagnosed with depression and anxiety in her teens, was assigned a GAF score of 46-50[10], received a variety of medications including Paxil, and was referred for counseling.  (Id.)

Ms. De Anda's records reflect that she next sought mental health care on May 18, 2011, at McLeod Medical Center, where she was seen by physician's assistant Raphaela Francis, PA-C. (Tr. 353-54.)   PA-C Francis diagnosed bipolar affective disorder, depression, and unspecified sleep disturbance, refilled Ms. De Anda's medications, and noted a plan for her to obtain counseling.  Thereafter, on May 23, 2011, PA-C Francis completed a Residual Functional Capacity Questionnaire addressing Ms. De Anda's physical and mental impairments.  (Tr. 287-88.)   As to Ms. De Anda's mental impairments, PA-C Francis assessed that Ms. De Anda's fatigue was often severe enough to interfere with her attention, concentration, and ability to perform simple work-related tasks. (Tr. 287.)   PA-C Francis described Ms. De Anda's "longstanding/chronic Bipolar Depression" as a limitation "that would affect [Ms. De Anda's] ability to work at a regular job on a sustained basis[.]" (Tr. 288.)

On October 18, 2011, Cathy L. Simutis, Ph.D., performed a consultative psychological evaluation and mental status exam of Ms. De Anda on referral from the Disability Determination

---

[9] Although the Court has reviewed and carefully considered the entire record, only Plaintiff's mental health records are relevant for purposes of this Order.

[10] The GAF is a subjective determination based on a scale of 100 to 1 of "clinician's judgment of the individual's overall level of functioning."  *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 32.

Services.  (Tr. 299-301.)  Dr. Simutis observed and noted that Ms. De Anda was tearful at times and had poor eye contact; that her rate of speech was pressured, but her tone was within normal limits; that there were no indications of psychotic thought processes; that her affect was anxious; that her gross intelligence appeared to be in the average range; that her insight appeared impaired; and that her judgment appeared limited but adequate.  (Tr. 300.)  Dr. Simutis diagnosed major depressive disorder; generalized anxiety disorder with panic attacks; posttraumatic stress disorder; cannabis abuse; alcohol abuse, early full remission; polysubstance abuse, early full remission; and borderline personality disorder.  (Tr. 301.)  Dr. Simutis assessed Claimant with a global assessment of functioning (GAF) score[11] of 35.  Dr. Simutis's prognosis was as follows:

> [Ms. De Anda's] prognosis is guarded.
>
> Her ability to understand and remember instructions appears to be markedly limited.  Her ability to concentrate and persist in a task appears to be mildly limited.  Her ability to interact with coworkers and the public appears to be markedly limited.  Her ability to adapt to change appears to be mildly limited.

(Tr. 301.)

On November 17, 2011, State agency nonexamining medical consultant Renate Wewerka, Ph.D., reviewed Ms. De Anda's medical records and prepared both a Psychiatric Review Technique ("PRT") and a Mental Residual Functional Capacity Assessment ("MRFCA").  (Tr. 79-81, 84-85.)  Dr. Wewerka indicated that Ms. De Anda had *moderate*

---

[11]  GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).  *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders, at* 32, 34.

limitations in her ability to (1) understand and remember detailed instructions; (2) to carry out detailed instructions; (3) to sustain an ordinary routine without special supervision; (3) to work in coordination with or in proximity to others without being distracted by others; (4) to interact appropriately with the general public; (5) to accept instructions and respond appropriately to criticism from supervisors; and (6) to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.   (Tr. 84-85.)   Dr. Wewerka explained that she rejected Dr. Simutis's assessment that Ms. De Anda had marked limitations in understanding and remembering because she found it to be inconsistent with her own mental status examination. (Tr. 80-81.)  Dr. Wewerka also rejected Dr. Simutis's assessment that Ms. De Anda had marked limitations in interacting with co-workers and the public because Ms. De Anda had demonstrated that she could follow through with medical and therapy appointments and because she shops. (*Id.*)  Finally, Dr. Wewerka provided the following additional explanation:

> Especially if clean and sober [Ms. De Anda] can at least understand, remember, and carry out detailed, but not complex instructions, make decisions, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors, and respond appropriately to changes in a work setting.

(Tr. 85.)

On March 5, 2012, State agency nonexamining medical consultant Ronald Chase, M.D., reviewed Ms. De Anda's medical records at reconsideration and prepared both a PRT and a MRFCA.  (Tr. 93-94, 98-100.)  Dr. Chase indicated that Ms. De Anda had *moderate* limitations in her ability to (1) understand and remember detailed instructions; (2) to carry out detailed instructions; (3) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;   (4) to accept instructions and respond appropriately to

criticism from supervisors; (5) to respond appropriately to changes in the work setting; and (6) to set realistic goals or make plans independently of others.  (Tr. 98-100.)  Dr. Chase provided the following additional explanation:

> Especially if clean and sober [Ms. De Anda] can at least understand, remember, and carry out detailed, but not complex instructions, make decisions, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors, and respond appropriately to changes in a work setting.
>
> A.   Understand and Memory:  [Ms. De Anda] has the mental capacity to perform SSRTs[12] [sic].
>
> B.   Sustained Concentration and Persistence:  [Ms. De Anda] would be able to complete simple tasks/work procedures and make work decisions, but may have difficulties carrying out detailed instructions.  [Ms. De Anda] may have some difficulties with maintaining concentration for extended periods.
>
> C.   Social: May have intolerance to criticism from others and or authority surrogates[.]
>
> D.   Adaptation:   There is no current evidence of psychosis, formal thought disorder, nor impaired reality testing.  No recent psychiatric hospitalization and no putative cognitive impairment documented that would preclude claimant's adaptation.  Considering the claimant's history of substance abuse it is held that with abstinence and sobriety the overall symptoms and mental functioning might improve.

(Tr. 100.)

On July 2, 2012 Ms. De Anda presented to the emergency department at New Hanover Regional Medical Center in Wilmington, North Carolina, and during evaluation reported that she was under a lot of stress, had recently started cutting again, was having suicidal thoughts but no plan and her current medications were not effectively treating her anxiety.   (Tr. 385-86.) Ms. De Anda was referred for mental health services upon discharge from the ER. (*Id.*)

---

[12] Simple routine repetitive tasks.  Soc. Sec. Disab. Prac. Appendix C.

On August 29, 2013, Ms. De Anda testified that she had stopped taking medications for her mental impairments during her pregnancy, but had started taking Fluoxetine and Valproic Acid after her son was born.[13]  (Tr. 52-53.)  Ms. De Anda testified that she had recently been attending counseling through Torrance County Counseling for her bipolar depression.[14]  (Tr. 55.)

**B.      The  ALJ  failed  to  properly  weigh  the  opinion  of  consultative psychologist Dr. Simutis.**

Ms. De Anda argues that the ALJ (1) incorrectly rejected Dr. Simutis's opinion on the basis that it was a one-time examination; (2) incorrectly relied on alleged inconsistencies of Ms. De Anda's subjective complaints; (3) selectively relied on only those parts of Dr. Simutis's exam to find she was able to work and ignored evidence favorable to her; and (4) mischaracterized her activities of daily living.  (Doc. 19 at 16-17.)  The Commissioner contends that ALJ was well within her discretion to reject Dr. Simutis's opinion based on the discrepancy in Ms. De Anda's subjective complaints, her daily activities, and the length of her relationship with Dr. Simutis.  (Doc. 23 at 7-8.)  For the reasons discussed below, the Court finds that the ALJ failed to properly weigh Dr. Simutis's opinion.

The applicable regulations and case law require an ALJ to consider all medical opinions and discuss the weight assigned to those opinions.  *See*  20 C.F.R.  §§ 416.927(c) and 416.927(e)(2)(ii); *see also Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) ("[a]n ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional.").  "An ALJ must also consider a series of specific factors in determining what

---

[13] Ms. De Anda testified that her son was five weeks old.  (Tr. 53.)

[14] The ALJ indicated she would hold the record open for ten days after the hearing for Ms. De Anda's attorney to provide these counseling records.  (Tr. 48, 55.)  The Administrative Record does not contain any records from Torrance County Counseling.

weight to give any medical opinion." *Hamlin*, 365 F.3d at 1215. (citing *Goatcher v. United States Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995)).[15]  An ALJ's decision need not expressly apply each of the six relevant factors in deciding what weight to give a medical opinion.  *Oldham v. Astrue*, 509 F3d. 1254, 1258 (10th Cir. 2007).  However, the decision must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and reasons for that weight." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).  The ALJ's decision for according weight to medical opinions must be supported by substantial evidence.  *Hackett v. Barnhart*, 395 F.3d 1168, 1174 (10th Cir. 2005).  An ALJ is required to give controlling weight to the opinion of a treating physician if is it supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  *Id.*  Generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a non-examining consultant is given the least weight of all.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  "If an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it." *Hamlin*, 365 F.3d at 1215.

The ALJ failed to properly evaluate and weigh Dr. Simutis's opinion pursuant to the required regulatory factors, and failed to provide specific, legitimate reasons supported by substantial evidence in rejecting her opinion.  The ALJ first explained that she rejected Dr. Simutis's opinion because she only performed a one-time examination of Ms. De Anda. (Tr. 37.)  However, a one-time consultative examination is not a valid basis for rejecting an

---

[15] These factors include the examining relationship, treatment relationship, length and frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist.  *See* 20 C.F.R. §§ 404.1527(c)(2)-(6) and 416.927(c)(2)-(6).

opinion.  *Chapo v. Astrue*, 682 F.3d 1285, 1291 (finding that a limited treatment history by itself is an invalid basis for rejecting a medical source opinion).  Although the ALJ should consider the length of a treatment relationship in weighing a *treating source* medical opinion, 20 C.F.R. § 416.927(c)(2)(i), to dismiss a consultative exam on this basis essentially renders them "worthless, when in fact they are often fully relied on as the dispositive basis for RFC findings." *Chapo*, 682 F.3d at 1291.  Further, the regulations governing medical opinions recognize that an examining medical-source opinion is presumptively entitled to more weight than a doctor's opinion derived from a review of the medical records.  *Id.* (citing 20 C.F.R. § 416.927(c)(1)).

The ALJ's other purported reasons for rejecting Dr. Simutis's opinion were likewise improper. The ALJ rejected Dr. Simutis's opinion, in part, because she found Ms. De Anda's subjective complaints regarding her panic attacks incredible.  Specifically, the ALJ found Ms. De Anda's subjective complaints regarding her panic attacks to be inconsistent because she reported to Dr. Karl Moedl on October 17, 2011, that she had not any *recent* panic attacks, and reported to Dr. Simutis on October 18, 2011, that she had weekly panic attacks.  (Tr. 37.) However, as Ms. De Anda properly points out, Dr. Moedl did not provide any context for "recent."  (Doc. 19 at 16.)  Additionally, in focusing on the presumed inconsistency of Ms. De Anda's subjective complaint regarding the frequency or timing of her panic attacks to discredit Dr. Simutis's opinion, the ALJ overlooked the fact that Ms. De Anda consistently reported to both consultative examiners that she experienced panic attacks. (Tr. 294, 300.)  More importantly, the ALJ ignored uncontroverted substantial evidence that supported Dr. Simutis's opinion.  *See* 20 C.F.R. § 416.927(c)(3).  For example, Dr. Simutis noted that Ms. De Anda reported symptoms of sadness, fatigue, worthlessness, guilt, difficulty thinking, difficulty concentrating, difficulty with decision making, daily thoughts about death, excessive anxiety,

restlessness, irritability, and hypervigilance.   (Tr. 300.)   These subjective complaints are supported by other evidence in the record.  Additionally Dr. Simutis noted that Ms. De Anda told her that she had recently attempted suicide by stabbing her arm with scissors.  (*Id.*)  The ALJ did not address this and other uncontroverted evidence of cutting behavior and frequent suicidal thoughts contained within the record.  Although the ALJ is not required to discuss every piece of evidence, the ALJ is required to discuss "uncontroverted evidence [s]he chooses not to rely upon, as well as significantly probative evidence [s]he rejects."  *Clifton v. Chater*, 79 F.3d at 1009; *Mays v. Colvin*, 739 F.3d at 576.   The ALJ erred in her failure to do so here.

Dr. Simutis performed a mental status exam during which Ms. De Anda reported she had seen shadow people before and had heard them whisper.  (*Id.*)   She also reported she had experienced feeling something try to pull her off her bed.  (*Id.*)  Based on her mental status exam, Dr. Simutis described her observations, provided diagnoses, and assessed a GAF of 35. (*Id.*)  The ALJ did not address Dr. Simutis's findings or their consistency with the record as a whole.   *See Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) (finding that psychological opinions may rest either on observed signs and symptoms or on psychological tests and constitute specific medical findings); *see also Cowan v. Astrue*, 552 F.3d 1182, 1189 (10th Cir. 2008) (explaining that a "true medical opinion" is one that contains a doctor's "judgment about the nature and severity" of a claimant's limitations).  For instance, the ALJ ignored the fact that Ms. De Anda consistently received low GAF scores.  (Tr. 276; 300.) *See generally*, *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1164 (10th Cir. 2012) (considering GAF scores and expressing "concern" with scores of 46 and 50); *Lee v. Barnhart*, 117 Fed.Apx. 674, 678 (10th Cir. 2004) (unpublished) ("Standing alone, a low GAF score does not necessarily evidence an impairment seriously interfering with a claimaint's ability to work . . ." but "[a]

GAF score of fifty or less, . . . does suggest an inability to keep a job."); *Rivera v. Astrue*, 9 F.Supp.3d 495, 501-07 (E.D. Penn. 2014) (remanding based on ALJ's failure to discuss GAF score). The ALJ also ignored that Dr. Simutis was a psychologist and provided a medical opinion in her area of specialty. 20 C.F.R. § 416.927(c)(5).

Although an ALJ need not expressly apply each of the six relevant factors in deciding what weight to give a medical opinion, her decision must provide specific reasons that are supported by substantial evidence for the weight given. *Oldham,* 509 F3d. at 1258; *Watkins*, 350, F.3d at 1300; *Hackett,* 395 F.3d at 1174. It is not clear to the Court that the ALJ considered the regulatory factors in weighing Dr. Simutis's opinion as she was required to do. The failure to provide this court with a sufficient basis to determine that appropriate legal principles have been followed warrants reversal here. *See Jensen v. Banhart*, 436 F.3d 1163, 1165 (10th Cir. 2005).

Finally, the ALJ improperly rejected Dr. Simutis's opinion based on Ms. De Anda's daily activities. The ALJ explained she rejected Dr. Simutis's opinion, in part, because the limitations Dr. Simutis assessed were inconsistent with Ms. De Anda's ability to prepare meals, grocery shop, do laundry, care for her son, and spend time with her girlfriend. (Tr. 37.) The specific facts behind these generalities paint a very different picture. *See Krauser v. Astrue*, 638 F.3d 1324, 1333 (10th Cir. 2011) (finding that the specific facts of claimant's daily activities painted a very different picture than the generalities relied upon by the ALJ). Ms. De Anda stated to Dr. Simutis that she was *able* to fix meals, grocery shop and do laundry. (Tr. 300.) However, she testified that she did not cook, did not grocery shop, and did not do laundry. (Tr. 56-57.) When questioned further at the administrative hearing about her ability to grocery shop, Ms. De Anda testified that she could grocery shop if she were driven to the store, provided with a list that contained only items that she could lift such as a can of beans, and if the store were small

"where there's like only two people in there[.]"  (Tr. 62.)  Ms. De Anda told Dr. Simutis that she

showered only once or twice a week, got dressed two to three times a week, and spent her days

in bed with her dog watching television or listening to music.  (Tr. 300.)  Ms. De Anda further

reported that she only spent time with her on and off girlfriend of six years and usually did not

leave home.  (*Id.*)  At the administrative hearing, Ms. De Anda further testified she lived with her

mother, stepfather, partner, and five-week-old son.  (Tr. 55-56.)  She testified she had a valid

driver's license, but did not drive.  (Tr. 56.)  She testified she did not pay bills.  (*Id.*)  She

testified that the only housework she did was light dusting.  (Tr. 57.)  Ms. De Anda testified that

she did not go to sporting events, concerts, festivals, attend church, or get together with friends.

(Tr. 59.)  She testified that she takes care of her son by giving him pre-made bottles, lying on the

floor with him and watching cartoons, and watching birds with him in the backyard.  (Tr. 57, 59.)

She testified that her mother and partner have to pick the baby up for her to hold and that they

give him his baths.   (Tr. 68.)   Thus, when considered at a more detailed realistic level,

Ms. De Anda's daily activities are more consistent with the nonexertional mental limitations

Dr. Simutis assessed.  *Krauser*, 638 F.3d at 1333); *see also Thompson v. Sullivan*, 987 F.2d

1482, 1490 (10th Cir. 1993) (finding that sporadic performance of activities of daily living does

not establish that a person is capable of engaging in substantial gainful activity).  As such, the

ALJ's reliance on De Anda's daily activities as a basis for rejecting Dr. Simutis's opinion is not

supported by substantial evidence.  *See Langley,* 373 F.3d at 1118 (A decision "is not based on

substantial evidence if it is overwhelmed by other evidence in the record.").

### 2.    <u>Nonexamining Source Opinions</u>

The ALJ stated that she gave "great weight to the State agency's finding that the claimant

can perform light work and simple job tasks with some deficits with co-worker contact[.]"

(Tr. 38.)   Ms. De Anda argues that the ALJ inappropriately relied on Dr. Wewerka's and Dr. Chase's  MFRCA conclusions, and ignored several of the moderate limitations they indicated that contradicted their conclusions.  (Doc. 19 at 18.)  In particular, Ms. De Anda claims the ALJ failed to consider limitations related to her ability to accept instructions from and respond appropriately to criticism from supervisors.  (Doc. 19 at 19-20.)  The Commissioner contends that the ALJ adequately addressed the nonexamining source opinions in assessing Ms. De Anda's RFC.  (Doc. 23 at 11.)  The Commissioner further contends that Section III of the MRFCA, not Section I, is for recording a medical consultant's formal mental RFC assessment, and the ALJ correctly relied on Dr. Wewerka's and Dr. Chase's Section III findings.[16]  (*Id.* at 11-12.)  The Court is not persuaded.

On November 17, 2011, Dr. Wewerka prepared a MRFCA.  (Tr. 84-85.)  Dr. Wewerka answered the questions presented regarding Ms. De Anda's social functioning and indicated, *inter alia*, that Ms. De Anda had *moderate* limitations in (1) her ability to interact appropriately with the general public; (2) in her ability to accept instructions and respond appropriately to criticism from supervisors; and (3) in her ability to get along with coworker or peers without distracting them or exhibiting behavioral extremes.  (Tr. 85.)  Far from recording her actual mental residual functional capacity assessment in the explanatory text box following each category as she was required to do, Dr. Wewerka simply stated "see PRTF" (*id.*), which indicated that she assessed Ms. De Anda as moderately limited in her social functioning for the purpose of evaluating the severity of her mental impairment for finding medical equivalence to a

---

[16] The MRFCA form in the Administrative Record is not formatted in the way the Commissioner describes.  (Tr. 84-85, 98-100.)  Instead, the form instructs that the questions presented are to help determine a claimant's ability to perform sustained work activities, but that the "actual mental residual functional capacity assessment is recorded in the narrative discussion(s)" following each category of limitation.  *Id.*  The form instructs that any other assessment information deemed appropriate can be recorded in the additional explanation text box.  (Tr. 84, 98.)

listed impairment.[17]   (Tr. 80.)   Dr. Wewerka then recorded assessment information in the additional explanation text box that "[e]specially if clean and sober," Ms. De Anda could interact adequately with co-workers and supervisors.  (Tr. 85.)  On March 5, 2012, Dr. Chase prepared a MRFCA.   (Tr. 98-100.)   Dr. Chase answered the same questions presented regarding Ms. De Anda's social functioning and indicated, *inter alia*, that Ms. De Anda had *moderate* limitations in her ability to accept instructions and respond appropriately to criticism from supervisors.   (Tr. 99.)   His actual mental residual functional capacity assessment in the explanatory text box that followed this category stated that Ms. De Anda "[m]ay have intolerance to criticism from others and or authority surrogates[.]"   (Tr. 99.)   Dr. Chase's additional explanation narrative repeated this same limitation in Ms. De Anda's social functioning.  (Tr. 100.)

The ALJ's decision fails to provide specific or clear reasons for the weight she accorded Dr. Wewerka's and Dr. Chase's opinions regarding Ms. De Anda's social functioning.  Here, the ALJ stated, without more, that she gave great weight to the State agency's findings.  (Tr. 38.)  In fact, the ALJ chose certain limitations from these opinions while rejecting others altogether, and failed to explain her reasoning for doing so.  This is error.  *See Haga v. Astrue*, 482 F.3d 1201, 1208 (10th Cir. 2007) ("An ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to finding of nondisability.").

Dr. Wewerka's assessment that Ms. De Anda could "interact adequately with co-workers and supervisors" clearly contradicted the moderate limitations she indicated regarding

---

[17] "The psychiatric review technique described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings.  The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."  SSR 96-8p, 1996 WL 374184, at *4.

Ms. De Anda's social functioning.  *See Carver v. Colvin*, 600 F. App'x 616, 619 (10th Cir. 2015)

(describing that if a consultant's Section III narrative contradicts limitations marked in Section I,

the MRFCA cannot properly be considered part of the substantial evidence supporting an ALJ's

RFC); *see also Haga*, 482 F.3d at 1208 (finding a moderate impairment is not the same as no

impairment at all).  That said, the ALJ appears to have acknowledged and considered, at least in

part, the conflict between Dr. Wewerka's moderate limitations and her ultimate assessment

because the ALJ's RFC limited Ms. De Anda to no contact with the public and occasional

superficial contact with co-workers.  However, in so doing, the ALJ provided no explanation

why she accepted these moderate limitations but rejected Dr. Wewerka's moderate limitation as

to Ms. De Anda's ability to accept instructions and respond appropriately to criticism from

supervisors.  Moreover, this limitation was fully supported by Dr. Chase, who specifically

assessed that Ms. De Anda may have intolerance to criticism from others and/or authority

surrogates.  (Tr. 99, 100.)  The ALJ accorded great weight to these opinions, yet rejected,

without explanation, their uncontradicted medical opinions regarding Ms. De Anda's limitations

in her ability to interact with supervisors.  This is error.  *Haga*, 482 F.3d at 1208; *Watkins,* 350

F.3d at 1300.

For the foregoing reasons, this matter requires remand so that the ALJ may apply the

correct legal standards in evaluating the medical opinion evidence, and to provide specific,

legitimate reasons supported by substantial evidence for the weight she accords it.

**C.**     **Substantial Justification**

The Commissioner bears the burden of proving that its position was substantially

justified.  *Kemp v. Bowen*, 822 F.3d 966, 967 (10th Cir. 1987).     The test for substantial

justification is one of reasonableness in law and fact.  *Gilbert v. Shalala*, 45 F.3d 1391, 1394

(10th Cir. 1995).  The government's position must be "justified in substance or in the main – that is, justified to a degree that could satisfy a reasonable person."  *Pierce v. Underwood*, 487 US. 552, 565, 108 S. Ct. 2541, 101 L.Ed.2d 490 (1988).  The government's "position can be justified even though it is not correct."  *Hackett*, 475 F.3d at 1172 (quoting *Pierce*, 487 U.S. at 565.)  A lack of substantial evidence on the merits does not necessarily mean that the government's position was not substantially justified.  *Hadden v. Bowen*, 851 F.2d 1266, 1269 (10th Cir. 1988).

Here, the ALJ failed to properly weigh Dr. Simutis's opinion and to provide specific, legitimate reasons that were supported by substantial evidence in rejecting Dr. Simutis's opinion. The ALJ also failed to provide specific reasons for why she accepted parts of Dr. Wewerka's and Dr. Chase's opinions while rejecting others after purportedly giving "great weight" to their opinions.  For these reasons, the government's position was not substantially justified.

### D.   Remaining Issues

The Court will not address Ms. De Anda's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand.  *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

## V.  Conclusion

For the reasons stated above, Ms. De Anda's Motion to Reverse or Remand for Rehearing is **GRANTED.**  This matter is remanded for further proceedings consistent with the Court's findings.

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding By Consent**